IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MILTON MANUEL SANCHEZ, CARMELO MEDINA, GERARD EDMOND, individually and on behalf of a group of individuals similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:12-cv-246 (GBL/TRJ) |
| v. | ) ) | |
| LASERSHIP, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 114), Defendant's Motion to Strike Portions of Plaintiffs' Evidence in Opposition to Summary Judgment (Dkt. No. 131), Defendant's Motion to Strike Portions of Plaintiffs' Declarations Submitted in Support of Their Motion for Class Certification (Dkt. No. 106), Plaintiffs' Motion to Certify Class (Dkt. No. 79), Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 118), Defendant's Motion to Strike Plaintiffs' Notice of Supplemental Authority (Dkt. No. 138), and Defendant's Motion for Leave to File Surreply in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 157). This case concerns an action brought by a purported class of delivery truck drivers, seeking declaratory relief that they are misclassified under the Massachusetts Independent Contractor ("IC") Statute, M.G.L. 149 § 148B ("Section 148B").

The issue before the Court is whether the Court should grant Defendant Lasership's Motion for Summary Judgment, which seeks a determination that Section 148B, which would

1

compel Lasership to classify its independent contractors as employees, is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"). The Court grants summary judgment because enforcement of Section 148B against motor carriers is preempted by the FAAAA. The Court concludes that Section 148B "relates to" or has a "connection with" motor carriers' prices, routes, and services because it (1) dictates the employment relationship carriers must utilize in its operations, thereby affecting carriers' routes and services; (2) significantly increases carriers' costs such as to have a significant effect upon carriers' prices, routes, and services; and (3) materially alters the common law test for independent contractor status, leading to a patchwork of varying state laws and resulting liability under varying independent contractor regimes. Accordingly, the Court grants summary judgment in favor of Defendant and against Plaintiffs. Therefore, Plaintiffs' Motion for Partial Summary Judgment is denied.

## I.   BACKGROUND

This case is brought by Plaintiffs and similarly situated individuals who perform delivery and courier services for Defendant Lasership. (Compl. ¶ 8.) Lasership is a transportation services company that arranges for the delivery of packages for its customers along the East Coast, servicing major consumer companies such as Amazon.com. (Aryan Decl. ¶ 3, Def.'s Mot. Summ. J., Ex. A, Dkt. No. 116-1.) Lasership operates to arrange for the delivery of packages through its use of independent contractors, performing no deliveries of its own. (*Id.* ¶ 5.) The independent contractors with whom Lasership contracts encompass sole proprietorships and corporate entities, which employ their own staff and agents to perform deliveries. (*Id.* ¶ 6.)

Though headquartered in Vienna, Virginia, Lasership maintains facilities in Woburn, Massachusetts and Meriden, Connecticut. Competing with similar businesses located in

2

Massachusetts and the surrounding New England area, including, Maine, Rhode Island, New Hampshire, and Vermont, Lasership contracts its independent contractors to navigate within and through these states to perform its deliveries. (*Id.* ¶ 4.) Independent contractors that deliver for Lasership report to its facility and are assigned delivery routes that traverse state lines. (*Id.*)

Lasership's business model is designed around its customer relationships and the services demanded by its customers. (*Id.* ¶ 12-16, 19-21.) Certain customers request regularly scheduled routes while others require irregular deliveries on an emergency, "as-needed," or "on demand" basis. (*Id.* ¶ 12; Aryan Dep. 114:17-115:4, Dkt. No. 116-2.) Specifically, deliveries of time-sensitive medical supplies or financial materials are not scheduled in advance, and Lasership's customers rely on its availability of independent contractors to meet their time-sensitive needs. (Aryan Decl. ¶ 12.) Due to the nature of these deliveries, they are not scheduled in advance, rendering their predictability impossible. (*Id.* ¶ 13; Aryan Dep. 157:12-159:9.) Likewise, Lasership's customers, such as Amazon.com, require Lasership to arrange for the delivery of their products each day by a specified time, not notifying Lasership of the upcoming day's volume until the day they are to be delivered, also rendering their predictably difficult. (Aryan Decl. ¶ 15.) The unique relationship Lasership has with each of its customers requires Lasership to employ its present business model to match the needs of its customers. (*Id.*)

Plaintiffs are Massachusetts-based delivery drivers that perform delivery services for Lasership as independent contractors. (Compl. ¶¶ 4-6.) Based out of the Woburn facility, Plaintiffs deliver packages for Lasership's customers through a contractual relationship pursuant to Independent Contractor Agreements ("ICAs") entered between Lasership and each driver. (Aryan Decl. ¶ 5; Aryan Dep. 63:13-64:9.) Under the terms of the ICAs, Plaintiffs are not entitled to common employee benefits, such as overtime pay, minimum wage, and health

insurance.  Rather, Plaintiffs, as independent contractors, bear the burden of costs associated with the services performed on behalf of Lasership.

On April 12, 2011, Plaintiffs filed a lawsuit against Lasership in Massachusetts state court for misclassification as independent contractors under the Massachusetts IC Statute, seeking compensatory damages under Massachusetts wage laws.  In June 2011, Lasership removed the case to the United States District Court for the District of Massachusetts, which dismissed the case without prejudice, based upon the forum selection clause in the ICA.  On March 6, 2012, Plaintiffs filed their Complaint in this Court for compensatory, declaratory, and injunctive relief, asserting: (1) misclassification as independent contractors in violation of the Massachusetts IC Statute (Count I); (2) unlawful refusal to pay wages and improper deductions from Plaintiffs' pay (Count II); (3) failure to pay minimum wage (Count III); and (4) violation of Plaintiffs' right to overtime pay (Count IV).  (Compl. ¶¶ 1, 35-38.)  Plaintiffs' wage and overtime claims are contingent upon the determination that they are properly classified as employees under the Massachusetts IC Statute.  Asserting that Lasership controls them as employees, Plaintiffs brought this suit challenging Lasership's classification of them as independent contractors under Section 148B.  Specifically, Plaintiffs aver that they report to Lasership's facilities daily, drive the same delivery route daily, are required to wear Lasership-embossed clothing, and are not free to deviate from their assigned routes without Lasership withholding future assignments.  (*Id.* ¶¶ 10-11, 16, 25.)  Thus, Plaintiffs argue that Lasership's control over them renders them "employees" for purposes of the statute.

On May 15, 2012, Lasership filed its first motion for summary judgment, seeking a determination that, as a matter of law, Section 148B, as applied to the motor carrier industry, is preempted by the FAAAA because it dictates how motor carriers perform their services.  (*See*

Dkt. No. 25.) Specifically, Lasership argued that compliance with Section 148B would (1) require motor carriers to provide services outside the entity's usual course of business; (2) create a barrier to entry for other interstate motor carriers who use independent contractors, creating a patchwork of differing state laws, impacting pricing, routes, and services; and (3) require motor carriers to comply with every employment-related statute in Massachusetts, including statutes requiring meal and rest breaks, payment of minimum wage, overtime, family and medical leave, deductions from wages, and maintenance of personnel records. (*See* Def.'s Mem. Supp. Mot. Summ. J. at 11-17, Dkt. No. 26.) Thus, Lasership concluded, it "would be forced to cease operations in Massachusetts if it were no longer able to use independent contractors to make deliveries." (Aryan Decl. ¶ 23.)

On August 27, 2012, the Court issued its Memorandum Opinion and Order, ruling on the parties' then-pending motions listed above. *See Sanchez v. Lasership, Inc.*, 2012 WL 3730636, at *1-*2 (E.D. Va. Aug. 27, 2012). First, the Court granted Plaintiffs' Motion for Partial Summary Judgment, concluding that Massachusetts law applied because the case concerned an issue of the contractual relationship between parties and the contract was formed in Massachusetts. *Id*. Second, and relevant to the present Motion, the Court granted Plaintiffs' Rule 56(d) Motion and denied Defendant's First Motion for Summary Judgment, concluding that Plaintiffs had demonstrated that they were entitled to more time to conduct discovery on the issue of FAAAA preemption. *Id*.

Following the Court's August 27, 2012 Order, the parties entered limited discovery on the FAAAA preemption issue and are now before the Court with their renewed motions. Specifically, Defendant Lasership filed its Second Renewed Motion for Summary Judgment, seeking a determination that enforcement of Section 148B is preempted by the FAAAA. (Dkt.

No. 114.) Lasership has also filed three evidentiary motions. Specifically, Lasership has filed a Motion to Strike Portions of Plaintiffs' Evidence Submitted in Opposition to Summary Judgment (Dkt. No. 131), Motion to Exclude Portions of Plaintiffs' Evidence Submitted in Support of Their Motion to Certify Class (Dkt. No. 106), and Motion to Strike Plaintiffs' Notice of Supplemental Authority (Dkt. No. 138). Lasership argues in each motion that portions of Plaintiffs' evidence are inadmissible on various grounds and, therefore, are not proper for the Court to consider on summary judgment. Lasership also has filed a Motion for Leave to File a Surreply in Opposition to Plaintiffs' Motion for Partial Summary Judgment. (Dkt. No. 157.)

Also pending before the Court are Plaintiffs' Motion to Certify Class (Dkt. No. 79) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 118). In their Motions, Plaintiffs seek to assert their claims against Lasership on behalf of a class of similarly situated individuals as well as on behalf of themselves and thus move for certification under Federal Rule of Civil Procedure 23. (Pls.' Mem. Supp. Mot. Class Certification at 11-22, Dkt. No. 81.) Specifically, Plaintiffs seek to certify the following class: "All individuals who performed delivery and/or courier services primarily in Massachusetts for Defendant Lasership, Inc., at any time since March 6, 2009." (*Id.* at 1-2.) In their Motion for Partial Summary Judgment, Plaintiffs' seek summary judgment on their central claim of misclassification under Section 148B. (Pls.' Mem. Supp. Mot. Partial Summ. J. at 2, Dkt. No. 119.) Plaintiffs argue that, because Lasership cannot satisfy Section 148B's independent contractor test, they are misclassified under the statute as a matter of law. (*Id.* at 2-3.)

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c) (2013).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party.  *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Anderson*, 477 U.S. at 247-48).

A "material fact" is a fact that might affect the outcome of a party's case.  *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477

U.S. at 248). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### III.   ANALYSIS

Lasership argues that it is entitled to judgment as a matter of law because Section 148B as applied to motor carriers is preempted by the FAAAA. The crux of Lasership's argument is that Section 148B fundamentally alters Massachusetts's independent contractor law in such a way that it is precluded from employing independent contractors, resulting in a substantial impact on its prices, routes, and services. Plaintiffs respond by arguing that Section 148B is merely a prevailing wage law and, as such, was not intended by Congress to be preempted by the FAAAA. Additionally, Plaintiffs argue that preemption should not apply because any impact Section 148B may have on motor carriers is far too tenuous or remote to be preempted.

The Court grants summary judgment because enforcement of Section 148B against motor carriers is preempted by the FAAAA. The Court concludes that Section 148B "relates to" or has a "connection with" motor carriers' prices, routes, and services for three reasons. First, the Court concludes that Section 148B is an unprecedented change in independent contractor law that dictates an end to independent contractor carriers in Massachusetts and imposes an anticompetitive, government-driven mandate that motor carriers change their business models to avoid liability under the statute. The effect of this material change in independent contractor law dictates the employment relationship carriers must utilize in their operations, thereby affecting carriers' routes and services. Second, the Court concludes that Section 148B's enforcement against motor carriers significantly increases carriers' costs such as to have a significant effect

upon carriers' prices, routes, and services.  Third, the Court concludes that, as applied to motor carriers, Section 148B materially alters the common law test for independent contractor status, leading to a patchwork of varying state laws and resulting liability under varying independent contractor regimes.  Accordingly, the Court grants summary judgment in favor of Defendant.

The Supremacy Clause of the United States Constitution implicates the doctrine of federal preemption.  *See* U.S. Const. art. VI, cl. 2.  A state law conflicting with federal law is said to be preempted and is "without effect."  *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 125 (4th Cir. 2008) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).  A federal statute may preempt state law in any of three manners:  (1) expressly by it terms, (2) impliedly by Congress's intent to occupy an entire field of regulation, or (3) by the state law's direct conflict with the federal statute.  *Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1111 (4th Cir. 1988) (citing *Mi. Canners & Freezers Assoc. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469 (1984)).

There are "two cornerstones" of federal preemption.  First, "the purpose of Congress is the ultimate touchstone in every preemption case."  *Wyeth v. Levine*, 129 S. Ct. 1187, 1194 (2009) (quoting *Lohr*, 518 U.S. at 485).  Second, where Congress has legislated in a field traditionally occupied by states, there is a presumption against preemption.  *Id.*  Courts do not lightly presume that Congress intended to supplant state law but instead begin with the opposite conclusion, as federalism militates respect for states as "independent sovereigns in our federal system."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  This is especially true in areas of traditional state regulation, such as relevant here—labor and employment laws.  *See Cal. Div. of Labor v. Dillingham Constr., N.A.*, 519 U.S. 316, 330 (1997).  "[W]here federal law is said to bar state action in fields of traditional state regulation," the assumption is that "the historic police

powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 1194-95. Thus, to identify congressional intent with respect to the FAAAA, the Court must not only examine the text of the statute itself but also review the history and purpose behind its passage. In doing so, the Court must remain "mindful of the Supreme Court's admonition that preemption 'is compelled whether Congress' command is explicitly stated in the state's language or implicitly contained in its structure and purpose.'" *Dilts v. Penske Logistics LLC*, 819 F. Supp. 2d 1109, 1116 (S.D. Cal. 2011) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)).

The FAAAA provides that no state "may enact or enforce a law related to a price, route, or service of any motor carrier . . . ." 49 U.S.C. § 14501(c)(1) (2012). The statute is categorized by certain types of motor carriers, including, as relevant here, motor carriers of property. *See* 49 U.S.C. § 14501(c). Each subsection, however, shares an identical preemption provision and serves to give effect to the statute's purpose—to preclude states from enacting laws related to motor carriers' prices, routes, or services. As discussed more fully below, the two textually operative phrases are "related to" and "prices, routes, or services." However, the statute offers little insight in terms of its breadth, and its preemption language does not explicitly encompass state regulation of wage and independent contractor laws relevant to this case. Therefore, the Court must look to the legislative history to determine whether it was Congress's "clear and manifest purpose" that Section 148B be preempted. *Dilts*, 819 F. Supp. 2d at 1116.

At the time of the FAAAA's enactment, forty-one states regulated, in varying degrees, intrastate motor carriers' prices, routes, and services. H.R. Conf. Rep. No. 103-677, at 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1758. Those regulations included entry controls, price regulation, and types of commodities transported. *Id.* Strict entry control regulations

10

impeded competition for certain routes while others strictly regulated trucking prices. *Id.* The diversity of state regulation in this field yielded a patchwork of state laws, resulting in "significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology, and curtail[ed] the expansion of markets." *Id.* at 86-88.

Ultimately, though, the FAAAA's enactment was triggered by the inequity following the Ninth Circuit's decision in *Federal Express Corp. v. California Public Utilities Commission*, 936 F.2d 1075 (9th Cir. 1991). *Id. Federal Express* involved a declaratory action brought by an air carrier arguing that the state's regulation of the trucking industry was preempted under the Airline Deregulation Act ("ADA") of 1978, the precursory and functionally equivalent statute that deregulated the airline industry. *Id.* at 1077. The air carrier's argument was grounded in its reliance on trucking operations as an essential part of its air carrier operations. The Ninth Circuit found that, because Federal Express's "all-cargo service" was a heavily integrated "hybrid" system, the motor carrier operations used in support of its larger air carrier operations were shielded from state regulation by the ADA's preemptive scope. *Id.* at 1079. Though Federal Express's motor carrier operations were protected from state regulation by virtue of its organization as an "air carrier," many of Federal Express's competitors remained organized as "motor carriers" despite the fact that they operated similar "hybrid" business models. *Id.* This inequity motivated Congress to act. H.R. Conf. Rep. No. 103-677, at 87, 1994 U.S.C.C.A.N. 1715, 1758.

Congress opined that "across-the-board deregulation was in the public interest as well as necessary to eliminate non-uniform state regulations of motor carriers . . . ." *Id.; Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1187 (9th Cir. 1998). Ultimately, Congress sought "to create a completely level playing field between air carriers . . .

and motor carriers . . . ." H.R. Conf. Rep. No. 103-677, at 82, 1994 U.S.C.C.A.N. 1715, 1755;

*Mendonca*, 152 F.3d at 1187. To do so, Congress adopted language from the ADA. H.R. Conf.

Rep. No. 103-677, at 83, 1994 U.S.C.C.A.N. 1715, 1755; *Rowe v. N.H. Motor Transp. Ass'n*,

552 U.S. 364, 368 (2008). Congress made clear its intent to incorporate ADA jurisprudence in

enacting the FAAAA to avoid any substantive change in either statute's preemptive scope. H.R.

Conf. Rep. 103-677, at 83, 1994 U.S.C.C.A.N. 1715, 1755.

Subsequent case law interpreting the preemption provisions of the ADA and the FAAAA

has attempted to delineate the FAAAA's preemptory scope, holding that state actions that have

at least a "significant impact related to Congress's deregulatory and preemption-related

objectives" are preempted while excluding those that only tenuously, remotely, or peripherally

affect carriers' prices, routes, or services. *Rowe*, 552 U.S. at 370-71. In *Morales*, the Court first

confronted the identical preemption provision of the ADA. The issue in *Morales* was whether

the enforcement of state guidelines directed toward airlines' deceptive advertising practices were

preempted. *Id.* at 383. Affirmatively answering this question, the Court found that, because the

guidelines at issue "establish[ed] binding requirements as to how [airline] tickets may be

marketed" and "imposed [obligations that] would have a significant impact upon . . . the fares

[airlines] charge," the guidelines were sufficiently "relate[d] to" airline rates and thus preempted.

*Id.* at 388. The Court adopted its construction of "relate to" from its preemption jurisprudence

under ERISA, defining it broadly as "having a connection with or reference to airline 'rates,

routes, or services.'" *Id.* at 384. In its conclusion, however, the Court reserved the question of

whether "[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a

manner' to have preemptive effect." *Id.* at 390.

In *Rowe*, the Supreme Court addressed whether the FAAAA preempted a state's tobacco delivery regulation, which imposed several requirements on drivers of tobacco products to ensure that tobacco products were properly verified. *Rowe*, 552 U.S. at 369. The state's objective was to prevent minors' access to tobacco. In holding the statute preempted, the Court adopted its reasoning in *Morales*, holding that, because the ADA and the FAAAA consisted of identical language, Congress drafted it "fully aware of the [Supreme Court's] interpretation of that language as set forth in *Morales*" and that "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." *Id.* at 370.

Thus, reaffirming *Morales*, the Court explained:

(1) that "[s]tate enforcement actions *having a connection with, or reference to*" carrier "'rates, routes, or services' are pre-empted," (2) that such pre-emption may occur even if a state law's effect on rates, routes or services "is only indirect," (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation, and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives.

*Id.* at 370-71. The Court found relevant the statute's effect of forcing carriers to provide services that differ significantly from those that the market might dictate, thereby substituting "its own governmental commands for 'competitive market forces.'" *Id.* at 372. With respect to the Maine statute at issue, the Court found preemption under the FAAAA because the statute "[forbade] licensed tobacco retailers to employ 'delivery service' unless that service follow[ed] particular delivery procedures." *Id.* at 371; *see also* Me. Rev. Stat. Ann., Tit. 22, § 1555-C(1), (3)(C). The statute's "focus[ ] on trucking and other motor carrier services . . . creat[ed] a direct 'connection

with' motor carrier services." *Rowe*, 552 U.S. at 371. Thus, the statute had a "significant and adverse impact in respect to the federal Act's ability to achieve its pre-emption-related objectives." *Id.* at 371-72 (citation and internal quotation marks omitted).

The *Rowe* Court also determined that the "Maine law . . . produce[d] the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.* at 372 (quoting *Morales*, 504 U.S. at 378). Significantly, the Court reasoned that the "law [would] require carriers to offer a system of services that the market does not now provide [and] would freeze into place services that carriers might prefer to discontinue in the future." *Id.* Permitting states to require motor carriers to provide particular services "could easily lead to a patchwork of state service-determining laws, rules, and regulations," which is "inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Id.* at 373.

The state statutes involved in *Morales* and *Rowe* were aimed directly at motor carriers. *Morales*, 504 U.S. at 390; *Rowe*, 552 U.S. at 365-66. *Rowe* conceded that, given the statutes' direct connection with carriers, neither *Morales* nor *Rowe* presented a "borderline" case from the perspective of preemption. *Rowe*, 552 U.S. at 366. However, in *American Trucking Ass'n, Inc. v. City of Los Angeles*, 660 F.3d 384 (9th Cir. 2011), the Ninth Circuit tested the "murkier" waters of a state regulation that did not directly regulate or specifically reference motor carriers rates, routes, or services but was nonetheless asserted to have an effect on carriers' operations. *Id.* at 396. *American Trucking* held that to determine the sufficiency of a state regulation's connection with a carrier's prices, routes, and services, the court must "examine the actual or likely effect" of the state regulation on carriers. The court went on to state that the appropriate

14

inquiry in such a case is "whether the provision, directly or indirectly, 'binds the . . . carrier to a particular price, route or service and thereby interferes with competitive market forces within the . . . industry.'" *Id.* at 397 (quoting *Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001)).

## A.   Section 148B's Change in Independent Contractor Law

The Court concludes that, as applied to motor carriers, Section 148B's unprecedented change in independent contractor law impermissibly dictates the type of employment relationship motor carriers may utilize and is therefore preempted by the FAAAA.

The "legislative purpose behind the [Massachusetts] independent contractor statute is to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors." *Somers v. Converged Access, Inc.*, 911 N.E.2d 739, 749 (Mass. 2009); *see also* Mass. Gen. Laws ch. 149 § 148B.  In enacting the IC Statute, the Massachusetts Legislature:

> appeared [to be] most concerned with . . . the "windfall" that employers enjoy from the misclassification of employees as independent contractors: the avoidance of holiday, vacation, and overtime pay; Social Security and Medicare contributions; unemployment insurance contributions; workers' compensation premiums; and income tax withholding obligations . . . . Misclassification not only hurts the individual employee; it also imposes significant financial burdens on the Federal government and the Commonwealth in lost tax and insurance revenues. Moreover, it gives an employer who misclassifies employees as independent contractors an unfair competitive advantage over employers who correctly classify their employees and bear the concomitant financial burden.

*Somers*, 911 N.E.2d at 750 (citations omitted).  In pertinent part, Section 148B provides:

(a) For the purpose of [Massachusetts wage laws], an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those [laws] unless:--

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B.[1] The statute imposes liability on "[w]hoever fails to properly classify an individual as an employee according to this section and in so doing fails to comply, in any respect, with [Massachusetts wage statutes]." *Id.* § 148B(d). Section 148B's requirements are thus conjunctive. The burden is on the putative employer to establish all three prongs, and failure to establish even one prong results in a finding of employee status. *Somers*, 911 N.E.2d at 748 (all "three criteria [are] required to establish that the plaintiff [is] an independent contractor" under Section 148B). As presented to the Court, Section 148B serves as the definitional section to a number of Massachusetts wage statutes, including, for example: (1) minimum wage, M.G.L. c. 151 §§ 1, 1A; (2) overtime, M.G.L. c. 151 §§ 1, 1A; (3) payment of wages, M.G.L. c. 149 § 148; (4) family and medical leave, M.G.L. c. 149 § 150A; and (5) deductions from wages, M.G.L. c. 149 §§ 150A, 150C. Thus, it is only a motor carrier's

---

[1] The basis of Lasership's preemption claim is the "usual course of business" prong. This prong of Section 148B was changed by amendment in 2004. Prior to its amendment, the second prong required that a contractor's service be "performed *either* outside the usual course of business for which the service is performed *or* [be] performed outside of all places of business of the enterprise." Mass. Gen. Law ch. 149, § 148B (2003) (emphasis added); *see also Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 36 n.1 (1st Cir. 2012).

16

misclassification under Section 148B *plus* its violations of one of these enumerated wage laws that subjects it to liability under the statute.

As an initial matter, the Court notes that Section 148B, on its face, is not expressly preempted by the FAAAA because it does not make explicit reference to motor carriers but rather generally applies to all Massachusetts employers irrespective of the industry in which they operate.   Thus, Section 148B seeks to generally regulate the classification of workers as independent contractors with respect to all Massachusetts employers and therefore makes no explicit reference to the prices, routes, or services of courier delivery service providers such as Lasership.  Nonetheless, the Court may still find Section 148B preempted if it "relates to" or has a "connection with" motor carrier services and its enforcement affects motor carriers' prices, routes, or services and that the effect is "significant."  *Rowe*, 552 U.S. at 370-71.  "[E]ven general statutes, when particularly applied to the [] industry, are preempted."  *Smith v. Comair, Inc.*, 134 F.3d 254, 257 (4th Cir. 1998).  It follows that to determine the extent of Section 148B's effect on the motor carrier industry generally, the Court must evaluate its impact upon Lasership and similarly situated carriers.  *Rowe*, 522 U.S. 364.  Indeed, "if a state law is preempted as to one carrier, it is preempted as to all carriers."  *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 77 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008).

At its core, Section 148B is an unprecedented and fundamental change in independent contractor law.  Its unique "usual course of business" prong is unlike any other statute in the country, as it is the only statute that requires independent contractors to perform services outside an entity's "usual course of business."  M.G.L. 149 § 148B(a)(2).  As discussed more fully below, *see* Section III.D., *infra*, other independent contractor statutes only account for an employer's usual course of business as one of many factors, if at all, in determining independent

17

contractor status. *Compare* Conn. Gen. Stat. § 31-222(a)(1)(B) (permitting a finding of independent contractor status if the services provided were *either* (1) outside the employer's usual course of business, *or* (2) performed outside of the employer's place of business), *with* Me. Rev. Stat. 26, § 664 (utilizing an eight-factor test, only one of which is the employer's usual course of business). Indeed, Plaintiffs cite no other independent contractor statute as restrictive as Massachusetts's Section 148B.

As applied to motor carriers such as Lasership, the effect of Massachusetts's change in independent contractor law is to bind carriers to utilize a certain type of employment relationship to carry out their operations. Specifically, Section 148B commands Lasership to convert its independent contractors to employees because its independent contractors perform services within Lasership's course of business. In other words, Lasership, which is in the business of providing package delivery services, is precluded from utilizing independent contractors also in the business of package delivery services. The "logical effect" therefore is a categorical ban on the use of independent contractors by motor carriers in Massachusetts. *Cf. Rowe*, 448 F.3d at 77 (examining the "logical effect that a particular scheme has on the delivery of services or the setting of rates"). This is true regardless of the degree of control Lasership exerts over its drivers because, as a conjunctive three-prong test, the usual course of business prong must be satisfied regardless of whether the degree of control prong is met. Consequently, under Section 148B, Lasership is deprived of its ability to choose with whom it decides to contract because, due to the nature of its line of service, every driver it employs to deliver packages will inherently fall within the "usual course of business" prong and therefore subjects it to liability. Indeed, Plaintiffs readily concede that, "Lasership cannot possibly satisfy the second prong of [Section 148B] because Lasership is in the delivery business, and Plaintiffs performed delivery services for

Lasership.   Under the second prong, only workers who perform services falling 'outside the usual course of business of the employer' may be deemed independent contractors." (Pls.' Mot. Partial Summ. J. at 15.)

Plaintiffs rely on *Mendonca* to support their contention that Section 148B is merely a wage statute, which they argue no court has ever found to be preempted because wage and labor laws are committed to the states' police powers and thus were not intended to be preempted by Congress.   The issue in *Mendonca* was whether the assessment of penalties against a carrier for its failure to pay California's Prevailing Wage Law ("CPWL") was preempted by the FAAAA. *Mendonca*, 152 F.3d at 1186.   The Ninth Circuit held that the CPWL was too indirect, remote, and tenuous to be "related to" the carrier's prices, routes, and services.   *Id.* at 1189.   The court noted that the CPWL was not the type of law to fall into the "field of law regulating prices, routes, or services."   *Id.*   Plaintiffs cite *Mendonca* for the proposition that wage laws are not intended to fall within the FAAAA's preemptive scope.   (Pls.' Mem. Opp'n Mot. Summ. J. at 14.)

The Court finds Plaintiffs' reliance on *Mendonca* unpersuasive for two reasons.   First, *Mendonca* preceded *Rowe*, which explicitly held that state law indirectly related to motor carriers' prices, routes, and services may nonetheless be preempted by the FAAAA if the effect is more than tenuous or remote.   *Rowe*, 552 U.S. at 370.   Here, the Court finds that Section 148B's effect of precluding Lasership from utilizing contractors in its present business model is fatal to its operation and is thus far from tenuous or remote.   As in *Rowe*, Section 148B relates to Lasership's business model by changing the contractual relationships Lasership currently has with its drivers and dictating what relationships it may use in the future.   Second, the court's analysis in *Mendonca* focused entirely on the CPWL's requirement of paying wages, which,

19

although relevant here, is not the central issue of this case. *Mendonca*, 152 F.3d at 1189. The issue here is the application of an unprecedented, restrictive independent contractor test against interstate motor carriers, which has the effect of binding carriers such as Lasership to a specific business model. The statute at issue in *Mendonca* did not involve an analogous statute with the same significant impact on motor carriers' business models.

Plaintiffs' reliance on *S.C. Johnson & Son, Inc. v. Transport Corp. of America*, 697 F.3d 544 (7th Cir. 2012), suffers from the same flaw. The issue in *S.C. Johnson* was whether enforcing state bribery and racketeering statutes against the trucking industry was preempted based upon their effect on carrier prices. *Id.* at 558-59. In explaining that all state laws that happen to touch upon a motor carrier's prices are not preempted, the Seventh Circuit cited *Mendonca* as an example of the types of laws typically held to not be preempted. *Id.* at 558. Specifically, the Court cited *Mendonca* for the proposition that minimum wage laws are not preempted by the FAAAA because "their effect on price is too 'remote.'" *Id.* (citing *Mendonca*, 152 F.3d at 1889). The Court holds that *S.C. Johnson* is inapplicable for the same reason *Mendonca* is inapplicable. *S.C. Johnson* did not address a statute that, such as here, directly changes the business models of motor carriers by dictating that they discontinue the use of certain employment relationships.

Lastly, with respect to Plaintiffs' argument that Congress did not contemplate that labor laws of general applicability fall within the purview of the FAAAA, the Court is mindful that wage and labor laws are properly left to the states' police powers and thus does not take lightly its departure from the strong presumption against preemption. *Wyeth*, 129 S. Ct. at 1194-95. However, the Court is not concerned here with whether states can enact laws to protect its workers and prevent misclassification of workers. States certainly can craft and enact such

legislation.  Rather, the Court is concerned about Section 148B's application to motor carriers operating in interstate commerce and its resulting effect of a state government dictating how carriers operate.  Consequently, Section 148B's mandate essentially is state regulation on the very business methods that carriers rely upon to efficiently operate and compete.

The Court opines that the FAAAA's structure and purpose compel a departure from the presumption against preemption in this case.  In enacting the FAAAA, Congress expressed concern about this very situation—state regulation that interfered with motor carriers' operations in interstate commerce.  H.R. Conf. Rep. No. 103-677, at 87-88, 1994 U.S.C.C.A.N. 1715, 1759-60.  Indeed, Congress sought to relieve motor carriers from the absurd inefficiencies in their operations, which made it difficult to efficiently conduct a standard way of doing business and impeded their ability to compete and provide quality services to their customers.  *Id.*  Lasership is able to provide quality services by using its flexible business model, one with sufficient malleability to efficiently conduct a standard way of doing business.  Elimination of independent contractors, as defined by common law or statutes in neighboring states, triggers a number of other labor laws, such as to make this law more than simply a wage law.  It becomes an outline of how a business must be structured, an overhaul of any motor carrier business model attempting to meet customer demand through flexible design.  As here, a complete overhaul of a motor carrier's business model is disruptive to the carriage itself and falls within the scope of conduct the FAAAA intended to prevent.  Compliance with Massachusetts's independent contractor law fundamentally alters the essence of Lasership's business model that relies on independent contractors who can make on-demand deliveries required by market forces and modern customer demand.  Though Congress intended that state laws not affecting carriers would remain in the police powers of the states, "the regulatory authority retained by the states

was not 'to be used as a guise for continued economic regulation as it relates to prices, routes or services.'" *United Parcel Serv. v. Flores-Galarza*, 318 F.3d 323, 337 (1st Cir. 2003) (quoting H.R. Conf. Rep. No. 103–677, at 84, 1994 U.S.C.C.A.N. 1676, 1756). Here, Section 148B amounts to governmentally mandated constraints on carriers' business models, affixed with a label of a fundamental state police power.

### B.    Effect on Motor Carriers' Routes and Services

The Court also finds that the record evidence further demonstrates that Section 148B's enforcement against motor carriers materially affects the services provided by virtue of this fundamental change of independent contractor law.

State regulations are preempted by the FAAAA when they form a connection with or relate to a carrier's prices, routes, or services. *Rowe*, 552 U.S. at 390. When a state regulation compels or binds a carrier to a particular route or service, the regulation is preempted. *Am. Trucking*, 660 F.3d at 397 (citing *Air Transport*, 266 F.3d at 1072). In *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998), the Ninth Circuit defined "services" within the ADA preemption context as "such things as the frequency and scheduling of transportation, and the selection of markets to or from which transportation is provided . . . ." *Id.* at 1265-66.   In *Ginsberg v. Northwest, Inc.*, 659 F.3d 1033, 1042 (9th Cir. 2011), the Ninth Circuit rejected ADA preemption of state common law claims because they did not "relate to" "services," as they had "nothing to do with schedule, origins, destinations, cargo or mail." *See also Dilts*, 519 F. Supp. 2d at 1119 (applying *Charas* and *Ginsberg* in finding that meal and rest break laws were preempted because they seemed to "directly and significantly relate[] to such things as frequency and scheduling of transportation").

Here, Section 148B relates to Lasership's services because it binds Lasership to a smaller set of possible services. *Dilts*, 819 F. Supp. 2d at 1118-19. The evidence before the Court conclusively demonstrates that Lasership's services are severely limited by the preclusion from utilizing contractors, which in turn "directly and significantly relate[] to such things as frequency and scheduling of transportation." *Id.* at 1119. Lasership, as do a vast majority of delivery businesses in Massachusetts, operates entirely through contractual relationships with its drivers because using independent contractors enables it to provide certain services, such as on-demand or as-needed deliveries. (Aryan Decl. ¶¶ 2, 9, 12-16; Aryan Dep. 173:3-8; Avery Dep. 45:16-19, 46:12-47:2.) Some of the independent contractors with whom Lasership contracts include individual drivers as well as independent businesses that have one or more drivers perform deliveries on behalf of the contractor. (Aryan Decl. ¶ 6; Deschenes Dep. 72:8-74:3.) This business model permits drivers to bundle their services such that they perform deliveries for multiple delivery companies. (Aryan Dep. 142:20-24, 143:1-10.) Lasership's customers rely on its flexibility to deliver items such as emergency medications and time-sensitive materials that are not scheduled in advance. (Aryan Decl. ¶ 12.) The availability of on-call contractors enables Lasership to efficiently meet its customers' demands. (*Id.* ¶ 15.)

Section 148B's effect on Lasership's services is also evidenced by Plaintiffs' own FAAAA-related discovery in which they deposed John Avery, President of Derby Logistics, Inc. ("Derby"), and an agent-courier company used by Lasership. In their previous Rule 56(d) motion, Plaintiffs argued that they were entitled to an opportunity to conduct discovery on FAAAA preemption in order to test Lasership's assertion that Section 148B affected its business in such a way that increases Lasership's prices and puts the company at a competitive disadvantage. *Sanchez*, 2012 WL 3730636, at *11-12. Following the Court's Order granting

23

Plaintiffs' Rule 56(d) motion, Plaintiffs only conducted the Avery deposition. Curiously, however, Avery's testimony actually revealed the dire consequences that a carrier faces when forced to convert its drivers to employees for Section 148B purposes. Avery testified that he converted Derby's drivers to employees in part because he feared being sued by Plaintiffs' counsel under Section 148B. (Avery Dep. 26:12-18.) Additionally, Avery testified that converting Derby to an employee model directly affected the services his company was able to provide as a carrier. (Avery Dep. 40:3-12.) Specifically, Avery admitted that, due to the lack of flexibility of using employee drivers, Derby is forced to avoid certain services such as on-demand work. (*Id.* 54:17-55:20.) His testimony also revealed that his business only survives because Derby was forced to discontinue services it previously provided. (*Id.* 8:11-12, 54:17-24.) Instead, Derby now provides only predictable "scheduled work" so that it can operate an employee-based model while maintaining compliance with Section 148B. (*Id.*)

The Court concludes that the full record before the Court demonstrates that Section 148B affects motor carriers' services by precluding Lasership from utilizing contractors under Section 148B's restrictive independent contractor test. The statute's enforcement against Lasership requires it to discontinue its on-demand services, which "would require changes in the way the service is provided." *DiFiore*, 646 F.3d at 88. Lasership's reliance on the flexibility of independent contractors, due to their freedom to bundle their services and carry multiple deliveries for different carriers at once, is essential to Lasership's business. As Fred Aryan testified, Lasership's customers rely on this critical business model, which is oriented around the guarantee of time-sensitive deliveries. (Aryan Decl. ¶¶ 2, 9, 12-16; Aryan Dep. 173:3-8.) To foreclose the possibility that Lasership use independent contractors would be a severe loss to a critical business function. Thus, by precluding the use of independent contractors, Section 148B

directly impacts the way in which Lasership schedules the transportation of its packages and reduces the frequency of its deliveries. Lasership's compliance "significantly affects the timeliness and effectiveness of [Lasership's] service, which includes the delivery of packages on an express or time-guaranteed basis." *United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003). Therefore, Section 148B must be preempted because it regulates "the essential details of a motor carrier's system for picking-up, sorting, and carrying goods— essential details of the carriage itself." *Rowe*, 552 U.S. at 373.

Section 148B also has the very effect that *Rowe* and *American Trucking* have held to be inconsistent with the objectives of the FAAAA, namely, a directive that Lasership must discontinue a service for which the marketplace has demonstrated an existing demand. *Rowe*, 552 U.S. at 372. Section 148B removes from commerce a courier business model available in forty-nine states but no longer in Massachusetts. Lasership's involvement in this litigation arises from the likely detrimental effect a conversion to an employee-based model will have on its commercial viability to provide services. However, Section 148B threatens to impose liability upon Lasership unless Lasership "change[s] the whole nature" of it business. *Am. Trucking*, 559 F.3d at 1058. It follows that Section 148B militates its "own governmental commands for 'competitive market forces.'" *Rowe*, 552 U.S. at 372. Lasership argues that its on-demand capability keeps it competitive with similar companies in contiguous states that utilize independent contractor-based business models and that its customers rely upon its flexible independent contractor-based business. The Court's agreement with Lasership is supported by John Avery's testimony that Derby's conversion to an employee-based model prevents his Massachusetts employee-drivers from delivering to Maine and New Hampshire because the costs associated with paying employees to make those long-distance deliveries makes providing such

25

services unprofitable. (Avery Dep. 39-40:22-5.) Avery also testified that Derby attempted to perform deliveries for Lasership's customer Amazon.com and found it was "impossible" to do so efficiently due to the constraints of a mandated employee-based model. (Avery Dep. 43:23-45:11.) Thus, Derby's inability to perform services similar to those that Lasership offers proves that being required to implement an employee model removes carriers from the competitive market force and demonstrates the impact employee-conversion has on customers' demand for Lasership's services. Thus, barring Lasership from utilizing independent contractors will have the effect of removing its business from the competitive market force and will require it to use an employee-based service that it currently does not wish to employ.

The Court also holds that Section 148B materially curtails Lasership's routes. To the extent that Lasership is precluded from utilizing independent contractors in Massachusetts who provide services in its usual course of business, Lasership is compelled to re-route drivers so as not to deliver packages originating from facilities outside of Massachusetts to destinations located within the Commonwealth. Were Lasership to do so, those drivers located outside of Massachusetts would be subject to Section 148B, and thus, Lasership would be forced to convert any driver who happened to enter the state to an employee. Lasership maintains facilities in contiguous states and often uses drivers based in its Connecticut facility to deliver packages to the western part of Massachusetts. (Deschenes Dep. 69:5-22.) As Fred Aryan explained, Lasership is permitted to use independent contractors in Connecticut, as it must to maintain competitive pricing and services, but Lasership would be unable to use those Connecticut-based drivers to deliver in Massachusetts because of Section 148B. (Aryan Decl. ¶ 18.) Thus, because Lasership does not maintain facilities in each contiguous state, enforcement of Section 148B will require Lasership to alter its routes to avoid liability under the statute and thus will place

Lasership at a significant competitive disadvantage to other carriers who are based and operating within those states. Unlike *Air Transport*, Section 148B forecloses Lasership from making its "own decision about where to [deliver] and how many resources to devote to each route." *Air Transport*, 266 F.3d at 1074. Section 148B effectively mandates Lasership's interstate routes by prohibiting its out-of-state drivers, who are not subject to the statute, from delivering across state lines without consequence. Additionally, as discussed more fully below, the costs associated with sending employee drivers further distances significantly shortens the routes carriers are able to make, further removing a carrier from the competitive market. (Avery Dep. 38:14-40:12.) These ramifications result in shorter and altered routes that Lasership and other carriers typically make in their current business operations. Thus, the Court concludes that Section 148B requires Lasership to alter its routes, thereby "relat[ing] to" and "bind[ing]" Lasership to particular routes. *Dilts*, 819 F. Supp. 2d at 1119.

### C.   Section 148B's Impact on Carriers' Prices

In addition to the above considerations, the Court concludes that Section 148B, as applied to Lasership, is preempted because its compliance significantly increases Lasership's costs, which impacts its prices, routes, and services.

As introduced above, the FAAAA also seeks to preempt state laws affecting motor carriers' prices by virtue of its effect of increasing costs. 49 U.S.C. § 14501(c)(1). Congress expressed concern that state regulation of motor carriers resulted in "increased costs" to carriers, resulting in a detrimental impact on the quality of services carriers could provide. H.R. Conf. Rep. No. 103-677, at 87, 1994 U.S.C.C.A.N. 1715, 1759. In *Rowe*, the Court held that a state law indirectly affecting carriers' prices, routes, or services could be preempted if the effect was significant and more than tenuous, remote, or peripheral. *Rowe*, 522 U.S. at 371. It follows that,

so long as the connection is not tenuous or remote and the economic impact is significant, increased costs that significantly affect prices can implicate preemption. *Id.* Therefore, "even if a state law or regulation does not have a direct impact on prices, in that it does not expressly set or limit prices, the law or regulation may have a substantial indirect effect on prices to the extent that it can be shown to impose significant additional costs on [carriers] that they, in turn, may pass on to their customers." *Prof'l Towing & Recovery Operators of Ill. v. Box*, No. 08 c 4096, 2008 WL 5211192, at *8 (N.D. Ill. Dec. 11, 2008).

In *Flores-Galarza*, the court held the same. The issue in *Flores-Galarza* was whether the Commonwealth of Puerto Rico could enforce a statutory regime against air carriers that required the carriers to prove that excise taxes were properly paid by the sender or else the carrier would have to satisfy the tax itself. 318 F.3d at 325. There, the court held the "challenged scheme both refers to and has a forbidden significant effect on UPS' prices, routes, or services." *Id.* at 335. After reviewing the evidentiary record, the court reasoned that preemption was warranted, in part, because the "costs of [the state law] necessarily ha[d] a negative effect on UPS' prices." *Id.* at 336. *Cf. Aretakis v. Fed. Express Corp.*, 2011 WL 1226278, at *4 (S.D.N.Y. Feb. 28, 2011) (report & recommendation of magistrate judge), *adopted*, 2011 WL 1197596 (S.D.N.Y. Mar. 25 2011) ("Exposing FedEx to liability . . . may also have a direct impact on the fees it charges for its services, as it is likely to pass on any added costs associated with this exposure to its customers.").

Here, the Court finds that the record demonstrates that Section 148B's enforcement against Lasership will likely have a significant impact on Lasership's prices. Lasership reports that its 2012 operating profit for its Massachusetts operations was $140,000. (SUF ¶ 27.) To offer health insurance to its employee-drivers, Lasership's costs would increase by $193,200 per

year. (*Id.* ¶ 28.) Providing workers' compensation insurance will cost Lasership up to $11.00 per $100.000 in earnings, ranging from $3,510 to $4,290 per driver each year. (*Id.* ¶¶ 30-32.) Thus, to provide workers' compensation insurance for all seventy of Lasership's current drivers, Lasership would incur costs ranging from $245,700 to $300,000. (*Id.* ¶ 32.) Additionally, independent contractors pay their own liability insurance, a cost that will be transferred to Lasership if it converts to an employee-based model. (*Id.* ¶ 33.) That cost alone is $196,000 per year. (*Id.*) By the Court's estimation, Lasership's costs would increase by up to $689,200. This figure is nearly five times Lasership's profit margin for 2012.

John Avery also testified on the impact on costs that occurred after Derby was forced to convert to an employee-based model due to Section 148B liability. He testified that Derby realized a $30,000 increase in costs due to paying workers' compensation. (Avery Dep. 32:24-33:5.) Avery also testified that health insurance premiums raised costs to about $18,000 per year. (*Id.* 34:3-10.) Overall, Avery reports that between payroll taxes, social security, unemployment, and health insurance, Derby's overall operating costs increased from $75,000 to $80,000 per year. (*Id.* 32:18-33:5.) With a fleet of only thirty drivers, Avery testified that these exorbitant costs inevitably raised Derby's rates for services. (*Id.* 8:3-4.) Avery also reported that Derby's rates are no longer competitive, as he has had to adjust his bids for contracts to account for the increased costs. (Id.) Specifically, Avery recounts that on one occasion the rate he bid for new business was $40,000 higher than Derby's competitors, exemplifying the difficulty Derby experiences in attaining new accounts. Avery testified that after converting his drivers to employees, Derby's business profits decreased from $200,000 per year to barely "breaking even." (Avery Dep. 51:16-24, 52:6-18.)

The Court finds Lasership's evidence compelling. The significant costs incurred by Lasership's compliance with Section 148B will have a significant impact on its prices. The Court is persuaded that these significant increases in Lasership's costs trigger FAAAA preemption, especially when that increase is likely to pass to consumers through increased prices. Indeed, "[a]nything that changes production costs will shift the supply curve, and hence will result in a new equilibrium price." Ben S. Bernanke & Robert H. Frank, *Principles of Microeconomics* 57 (3d ed. 2007). Consistent with basic economics, therefore, the high costs incurred by Section 148B's compliance will undoubtedly have to be recouped by raising prices. Though Section 148B does not explicitly set Lasership's prices, it is preempted because Lasership has made a sufficient evidentiary showing that the significant additional costs imposed by Lasership's compliance will likely affect its prices.

The Court finds that these increases in costs significantly impact carriers' rates for services and materially impact the routes and services carriers are able to provide. Avery testified that treating his drivers as employees equates to decreasing the length of drivers' routes so as to limit overtime costs, which consequently precludes his business from providing long-distance services. His testimony demonstrates that carriers subject to Section 148B are unable to service longer-distance customers without suffering significant lost profits or increasing rates due to employee-related expenses. Thus, increased costs force shortened routes or discontinued deliveries to remote destinations. To the extent that Lasership must discontinue its on-demand services, its terms of its service, and thus its prices, must also change. "Terms of service determine costs. To regulate them is to affect price." *Fed. Express Corp. v. Cal. Pub. Utils. Comm'n*, 936 F.2d 1075, 1078 (9th Cir. 1991). Additionally, carriers such as Lasership and Avery must bid higher for contracts. If unable to bid a reasonably lower rate, due to having to

recoup high costs, these carriers are no longer competitive with other carriers in contiguous states who are able to utilize an independent contractor-based model, incur fewer overhead expenses, and are thus able to bid lower rates for new accounts. This result is inconsistent with the FAAAA's objectives to promote marketplace autonomy.

Plaintiffs' contrary position is that the FAAAA "does not refer to impact on costs" but rather refers to "impact on prices." (Pls.' Opp'n Mot. Summ. J. at 25.) Plaintiffs again rely entirely on *Mendonca* and *S.C. Johnson* for this proposition, both of which the Court finds unpersuasive. Plaintiffs cite *Mendonca* for their position that wage statutes are not within the FAAAA's purview because *Mendonca* found that a state law was not preempted despite that the law increased the carrier's prices by 25% to offset increased costs. 152 F.3d at 1189. The court found that any effect on the carrier's prices was too "indirect, remote, or tenuous" to fall within the FAAAA's preemptive scope. *Id.* at 1188-89. However, the Court rejects *Mendonca* for three reasons. First, *Mendonca*, upon which *S.C. Johnson* also relies, preceded *Rowe*, which held that a state law could be preempted if the law indirectly affects carriers' prices, routes, or services, if the effect was significant and more than tenuous, remote, or peripheral. *Rowe*, 522 U.S. at 371. After reviewing the full evidentiary record, the Court concludes that Lasership has made a sufficient showing that Section 148B's impact on its costs is significant by virtue of the statute's mandate that it discontinue the use of independent contractors. Rather, the Court finds that the impact on prices is far from tenuous or remote. Second, the court in *Mendonca* did not fully analyze a complete evidentiary record similar to that presently before the Court. Rather, *Mendonca*, in a rather conclusory fashion, considered the carrier's 25% increase in costs as only one of the considerations it relied upon in finding that the state regulation was not preempted. *Mendonca*, 152 F.3d at 1189. Third, subsequent cases decided since *Mendonca* have held that

31

preemption can occur upon a finding that a state law sufficiently relates to carriers' prices by significantly increasing costs. *See Air Transport*, 266 F.3d at 1075; *Aretakis*, 2011 WL 1226278, at *4; *Professional Towing*, No. 08 c 4096, 2008 WL 5211192, at *8; *Flores-Galarza*, 318 F.3d at 325. Therefore, the Court rejects Plaintiffs' reliance on *Mendonca* and holds that Lasership has demonstrated with competent evidence that Section 148B's enforcement against it will significantly impact its costs and prices.

Next, Plaintiffs cite *S.C. Johnson* for its holding that:

> labor inputs are affected by a network of labor laws, including minimum wage laws, worker-safety laws, anti-discrimination laws, and pension regulations . . . . . Changes to these background laws will ultimately affect the costs of these inputs, and thus, in turn, the 'price . . . or service' of the outputs. Yet no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws

*S.C. Johnson*, 697 F.3d at 558 (citing *Mendonca*, 152 F.3d at 1189). Once again, *S.C. Johnson* fails for the same reason *Mendonca* does, as it primarily relies on *Mendonca*, which the Court has already rejected. As stated, Section 148B requires that Lasership incur high costs associated with using employee-drivers rather than independent contractors, binding Lasership to incur costs it otherwise would not. However, even assuming that labor costs alone are insufficient to warrant preemption, the costs realized by Section 148B's enforcement against Lasership transcend mere labor expenses. As the Court has explained, if Lasership elects to continue its current services, such as its on-demand services and long-distance deliveries, utilizing an employee-based model in compliance with Section 148B, the statute will also have the effect of dictating Lasership's prices by virtue of Section 148B's restrictions, as Lasership's prices charged to its customers will likely reflect the costs incurred as a result of Lasership's employee conversion. In this regard "the impact is derived from the imposition of restrictions," not merely increased labor costs, that "binds [Lasership] to a set of routes, services, schedules, origins, and

destinations that it otherwise would not be bound," which in effect increase its costs and prices. *Dilts*, 819 F. Supp. 2d at 1122. For this reason, the Court is not convinced that *S.C. Johnson* is entirely applicable here. Accordingly, the Court rejects Plaintiffs' arguments and concludes that Section 148B, as applied to Lasership, is preempted because it relates to Lasership's prices by significantly increasing its costs and prices due to its restrictive provisions.

### D.  Section 148B Creates a Varying Patchwork of State Laws

The Court also finds Section 148B preempted because it creates a patchwork of differing state laws that impact motor carriers' routes and services, a result that *Rowe* explicitly held to be inconsistent with the FAAAA. *See Rowe*, 522 U.S. at 373. *Rowe* announced that state requirements that lead to a "patchwork of state service-determining laws, rules, and regulations" were "inconsistent with Congress's major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Id.* As discussed previously, Section 148B is a "service-determining" law because it has the effect of dictating carriers' services. Moreover, the unique "usual course of business" provision of Section 148B is a dramatic change in independent contractor law such that its enforcement against Lasership and similar interstate carriers will lead to an unprecedented patchwork of varying state independent contractor laws.

Lasership submits that Massachusetts's unique independent contractor statute creates a barrier of entry for its drivers based in other states and effectively precludes it from using its Massachusetts-based employees, if required to convert to an employee model, to make deliveries to contiguous states. Connecticut's statute provides that "[s]ervice performed by an individual shall be deemed to be employment . . . unless and until it is shown to the satisfaction of the administrator that . . . (II) such service is performed *either* outside the usual course of the business for which the service is performed *or* is performed outside of all the places of business

of the enterprise for which the service is performed." Conn. Gen. Stat. § 31-222(a)(1)(B)(ii)(II) (emphasis added). Thus, Connecticut statute's "usual course of business" prong alternatively permits a finding of independent contractor status if services are performed outside the carriers' usual place of business. Notably, this prong is analogous to the prong used in Section 148B prior to its 2004 amendment. *See* Mass. Gen. Law ch. 149, § 148B (2003). Vermont also uses an identical test. *See* 21 VT Stat. Ann. 21 § 1301(6)(B). Other states' statutes are also less restrictive. Maine's test weighs eight independent factors to determine independent contractor status, only one of which is "whether the work is part of the regular business of the employer." *See, e.g.*, Me. Rev. Stat. 26, § 664; *Rainey v. Langen*, 998 A.2d 342, 347 n.4 (Me. 2010). New Hampshire and New York's statutes do not event taken into account whether the work is part of the employer's regular course of business. *See, e.g.*, N.H. Rev. Stat. Ann. § 254:4; N.Y. Labor Law § 511. An examination of these statutes indicates that Massachusetts's test is the most restrictive and prohibitive independent contractor test used in its surrounding region, as these neighboring states do not entirely prohibit carriers from utilizing independent contractors for work performed in the same course of business, if at all, so long as the work is performed outside the employer's place of business.

The Court finds Lasership's argument persuasive. The effect of Massachusetts's unprecedented change in independent contractor law is to create a barrier of entry for interstate carriers and place an undue burden on market competition, which is foreclosed by the FAAAA. Massachusetts-based carriers in the position of Lasership that deliver interstate must navigate differing state laws to perform their deliveries. Lasership's Massachusetts-based drivers deliver packages to New Hampshire, Maine, Vermont, and Rhode Island. (Deschenes Decl. ¶ 3.) Lasership also uses its Connecticut-based drivers for deliveries to Massachusetts. (*Id.*)

However, under Section 148B, Lasership cannot utilize independent contractors to perform deliveries in Massachusetts. Therefore, whereas Lasership may be permitted to use independent contractors in Connecticut due to the less-restrictive independent contractor test, it is not permitted to do so in Massachusetts without being subject to Section 148B liability. Additionally, Lasership is placed at a distinct market disadvantage because companies based in contiguous states that are subject to less restrictive statutes are able to utilize the more efficient independent contractor model with lower overhead costs and higher profits than Lasership operating in Massachusetts burdened with governmentally-mandated employee drivers.

Plaintiffs argue that, because the above identified statutes already each employ a different test, the Court should presume that the FAAAA does not preempt these laws, as the "patchwork" of laws alleged by Lasership already exists and has for some time. Recognizing that every state has a slightly different independent contractor test, the Court concludes that the test employed by Section 148B is necessarily restrictive such that its criteria cannot be satisfied by interstate carriers subject to the traditional common law independent contractor tests employed by other states. The contiguous states' statutes cited are more appropriately in accord with the common law test for independent contractor status, and Section 148B materially changes that. Therefore, carriers operating under the less restrictive statutes are more likely to satisfy other state statutes that do not contain Section 148B's restrictive provision. This is particularly true with respect to carriers in the business of package delivery services who must hire drivers within its course of business to operate. It is thus clear that Section 148B creates the potential for substantially different laws being applied against interstate carriers than those that already exist in contiguous states, thus creating a patchwork of laws that the FAAAA prohibits. *Rowe*, 552 U.S. at 373. To allow Massachusetts to enforce a heightened independent contractor standard against interstate

carriers, such that it changes carriers' prices, routes, and services so as to navigate varying statutory regimes, would allow other states to do the same. *Id.* at 375. The FAAAA forecloses such a result.

### E.   Recent Case Law Cited by Plaintiffs is Distinguishable and Not Persuasive

Plaintiffs cite the decision of a Massachusetts's district court in which the court held that Section 148B is not preempted by the FAAAA. In *Celso Martins v. 3PD*, No. 11-11313 (D. Mass. Mar. 27, 2013), the district court concluded that the FAAAA does not preempt Section 148B because the plaintiffs' common law claims were "not attempts to enforce or expand any bargain" contractually reached by the parties, but merely sought to "clarify [the defendant's] obligations as an employer or proprietor." *Id.* at 29. *Martins* also held that, because Section 148B "does not regulate the price" of services charged but only "regulates the operation of the underlying employment relationship which plays a role in setting the market price," it is not preempted by the FAAAA, as it "is not sufficiently related to the 'price, route, or service.'" *Id.* at 31 (citing *S.C. Johnson*, 697 F.3d at 558). *Martins* seems to have adopted Plaintiffs' argument that Section 148B should be construed merely as a "background" or "wage" law not intended to fall within the FAAAA's preemptive scope.

Acknowledging that the Court reaches a different conclusion than that reached in *Martins*, the Court respectfully disagrees with *Martins*'s reasoning and declines to adopt its holding for four reasons. First, the Court notes that *Martins* did not present the same substantive analysis the Court has applied in this case due, in large part, because the case was posited differently, as the defendant in *Martins* argued that the plaintiffs' common law claims were preempted rather than, as presented here, that Section 148B was preempted. Only addressing arguments related to carriers' contractual bargaining rights and pricing with respect to plaintiffs'

common law claims, *Martins* failed to consider Section 148B's impact on carriers' business models due to its unprecedented change in independent contractor law. As the Court has explained, Section 148B does more than merely regulate the employment relationship under traditional employment and labor laws. Rather, Section 148B dictates the types of employment relationships utilized by carriers, which in turn gravely impacts carriers' prices, routes, and services. Second, the *Martins* court did not have the benefit of the substantial evidentiary record that this Court has before it. The overwhelming evidence here conclusively demonstrates that Section 148B's enforcement against interstate motor carriers significantly impacts prices, routes, and services. Third, as the Court explained, the arguments made by the defendant in *Martins* with respect to pricing were posited differently, such that the Court did not analyze Section 148B's effect on carriers' pricing through the same lens. The defendant in *Martins* merely argued that Section 148B affected the rates paid to drivers rather than carriers' costs, which in turn are passed on to customers through prices, which then affect the routes and services offered in the marketplace. Fourth, *Martins* failed to consider Section 148B's distinct and restrictive independent contractor test, which if allowed to stand, would permit other states to adopt their own untraditional tests for independent contractor status, creating a patchwork of state laws nested in the guise of labor laws, which have the effect of dictating the types of employment relationship to be utilized in the marketplace. This effect is entirely inconsistent with the FAAAA's objectives. For these reasons, the Court respectfully declines to adopt *Martins* for the proposition that Section 148B is preempted.

## IV. CONCLUSION

The Court also does not take lightly its departure from the presumption against preemption. However, Congress has intended to free interstate carriers from the reins of state

interference to promote marketplace autonomy, and a statute as prohibitive as Section 148B that has such a disruptive effect on interstate carriers, and thus commerce, squarely contradicts Congress's intent and the FAAAA's structure and purpose.  The Court's decision should not be construed as giving *carte blanche* to carriers to avoid compliance with all employment-related state regulation, nor does the Court intend to depreciate the states' police powers in protecting its citizens and businesses through important wage and labor laws.  Rather, the Court's ruling is intended to be narrow in its application to motor carriers.  The Court concludes that Section 148B, as applied to motor carriers, is preempted by the FAAAA because of its significant impact on carriers' prices, routes, and services, as well as its effect of creating a patchwork of state laws that attempt to do more than merely regulate the employment relationship but directly impacts the business models of these carriers.  The effect of Section 148 binds carriers to certain business models that the marketplace does not require, burdening Massachusetts carriers in the competitive marketplace, a result foreclosed by the FAAAA.  Congress has spoken on such an effect and it is incumbent upon the Court to interpret the FAAAA statute and give effect to its objectives in enacting the FAAAA.

For the foregoing reasons, it is hereby

**ORDERED** that Defendant Lasership's Motion for Summary Judgment (Dkt. No. 114.) is **GRANTED**.  Judgment is entered in favor of Defendant and against Plaintiffs on all counts.  It is further

**ORDERED** that, for the reasons stated in Defendant's brief, Defendant's Motion to Strike Portions of Plaintiffs' Evidence in Opposition to Summary Judgment (Dkt. No. 131) is **GRANTED**.  It is further

**ORDERED** that Defendant's Motion to Strike Plaintiffs' Notice of Supplemental Authority (Dkt. No. 138) is **DENIED**.  It is further

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 118) is **DENIED**, as the Court's conclusion that Section 148B is preempted by the FAAAA forecloses the relief sought by Plaintiffs' in their Motion.  It is further

**ORDERED** that, for the reasons stated in Defendant's brief, Defendant's Motion for Leave to File Surreply in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 157) is **GRANTED**.  It is further

**ORDERED** that Plaintiffs' Motion to Certify Class (Dkt. No. 79) and Defendant's Motion to Strike Portions of Plaintiffs' Declarations Submitted in Support of Their Motion for Class Certification (Dkt. No. 106) are **DENIED** as moot.

**IT IS SO ORDERED.**

ENTERED this _3rd_ day of April, 2013.

Alexandria, Virginia
4/ _3_ /2013

_/s/_
Gerald Bruce Lee
United States District Judge